UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN ANTONIO COVARRUBIAS,<br><br>    Petitioner,<br><br>  v.<br><br>S. HATTON, Warden,[1]<br><br>    Respondent. | Case No. EDCV 16-1681-JFW (KK)<br><br>FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

   This Final Report and Recommendation is submitted to the Honorable John F. Walter, United States District Judge, pursuant to Title 28 of the United States Code, section 636 and General Order 05-07 of the United States District Court for the Central District of California.

///

---

[1] On October 30, 2016, Petitioner constructively filed a Motion to Amend Named Respondent ("Motion") from Ronald Rackley to S. Hatton. ECF Docket No. ("Dkt.") 14, Mot. at 1. According to the Motion, Petitioner was transferred to Soledad State Prison and, as a result, was placed under the custody of the Soledad State Prison warden, S. Hatton. See Rumsfeld v. Padilla, 542 U.S. 426, 434, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004) ("'[T]he proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" (citing 28 U.S.C. § 2242)). Given that no argument has been raised to challenge the Court's jurisdiction based on the originally named respondent, the Court will proceed as though the right to contest personal jurisdiction has been waived. See Smith v. Idaho, 392 F.3d 350, 355-56 (9th Cir. 2004). Accordingly, the Court grants Petitioner's Motion and amends the caption to reflect the properly named Respondent.

## I.
## SUMMARY OF RECOMMENDATION

Juan Antonio Covarrubias ("Petitioner"), a California state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to Title 28 of the United States Code, section 2254(d), challenging his 2013 conviction for second degree murder in Riverside County Superior Court.  On habeas review, Petitioner sets forth a single claim of evidentiary error depriving him of a fair trial.  Because Petitioner's claim fails on its merits, the Court recommends the Petition be denied.

## II.
## CLAIM FOR RELIEF

Petitioner's claim, as presented in his Petition, is as follows: The trial court erred in admitting highly prejudicial testimony from two employees of Mothers Against Drunk Driving ("MADD"), thus, depriving him of his due process right to a fair trial.  Dkt. 1, Pet. at 5.

## III.
## PROCEDURAL HISTORY

On March 13, 2013, following a jury trial in Riverside County Superior Court, Petitioner was convicted of second degree murder.  Lodgment No. ("lodg.") 1 at 328.[2]  On May 8, 2013, the trial court sentenced Petitioner to fifteen years to life in state prison.  Id.

---

[2]   The Court's citations to Lodged Documents refer to documents Respondent lodged in support of the Answer.  See dkt. 9, Not. of Lodging.  Respondent numbers the documents as follows:

1. Clerk's transcripts ("CT") (Vols. 1-2)
2. Reporter's transcripts ("RT") (Vols. 1-4)
3. Appellant's opening brief
4. Respondent's brief
5. Appellant's letter brief
6. Respondent's letter brief
7. California Court of Appeal Opinion
8. Petition for review

On May 9, 2013, Petitioner filed a direct appeal to the California Court of Appeal ("Court of Appeal"). Id. at 327. On May 12, 2015, the Court of Appeal affirmed Petitioner's conviction in a reasoned decision. Lodg. 7.

On June 22, 2015, Petitioner filed a petition for review in the California Supreme Court. Lodg. 8. On August 12, 2015, the California Supreme Court denied review of the appeal. Lodg. 9.

On July 19, 2016, Petitioner constructively filed[3] the instant Petition. Dkt. 1. On August 3, 2016, Respondent filed an Answer, contending the Court of Appeal reasonably concluded there was no constitutional error and, even if there was error, the error was harmless. Dkt. 8. On October 10, 2016, Petitioner filed his traverse.[4] Dkt. 10. The matter thus stands submitted and ready for decision.

## IV.

## **RELEVANT FACTS**

For a summary of the facts, this Court relies on the Court of Appeal's reasoned decision on Petitioner's direct appeal:[5]

> On the morning of March 31, 2012, Covarrubias crashed the SUV he was driving into the rear of victim Gyla Walters's car while she was stopped at an intersection. The impact pushed Walters's car

---

[3] Under the "mailbox rule," when a pro se prisoner gives prison authorities a pleading to mail to court, the court deems the pleading constructively "filed" on the date it is signed. Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010) (citation omitted). This Court presumes Petitioner gave his Petition to prison authorities on the date it was signed.

[4] Petitioner attempts two additional claims in his Traverse that were not included in the Petition: 1) ineffective assistance of counsel, and 2) improper jury instruction. Dkt. 10. The Court declines to review these new claims because a petitioner is not permitted to raise new claims in a Traverse. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

[5] Because this factual summary is drawn from the Court of Appeal's opinion, "it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence." Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2008) (citations omitted). To the extent Petitioner challenges the accuracy of this summary, the Court has independently reviewed the trial record and finds the summary accurate.

3

into the intersection and caused her car to burst into flames. Covarrubias and Covarrubias's cousin emerged from the SUV. Covarrubias walked up to another car and offered one of its passengers $500 to drive him away from the scene. The passenger refused and then watched as Covarrubias unsuccessfully attempted to open a door of Walters's burning car. Covarrubias next tried to get into another car, but its driver sped off. Bystanders walked Covarrubias to the side of the road to wait for the police.

Covarrubias approached the first police officer who arrived at the scene and said, "I did it. I ran the red light. I killed – I killed a person." Covarrubias voluntarily put his hands behind his back, and the officer handcuffed him. The officer observed that Covarrubias smelled of alcohol, his speech was slurred, and his eyes were bloodshot. The officer transported Covarrubias to the police station, where his blood was drawn. A forensic toxicologist who analyzed the blood sample estimated Covarrubias's bloodalcohol level at 0.20 percent at the time of the crash.[2]

Footnote 2: Covarrubias's blood was drawn about 60 to 90 minutes after the crash. The bloodalcohol level of that sample was 0.19 percent.

At the police station, another officer interviewed Covarrubias. Covarrubias admitted driving the SUV that crashed into Walters's car. He told the officer that he went to a nightclub with friends the previous night to celebrate his upcoming birthday. While there, he drank "[t]equila mix, tequila and vodka." He told the officer that he left the nightclub around two in the morning to go to a party where he

4

>drank more alcohol "for several hours." Covarrubias said his cousin warned him not to drive after leaving the party. A traffic collision investigator testified that when he arrived on scene, Walters's car was burning. He concluded Walters died because of the fire.

Lodg. 7 at 2-4.

## V.
## **STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless the adjudication:

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of th[e] [United States Supreme] Court's decisions'" in existence at the time of the state court adjudication. White v. Woodall, ___ U.S. ___, 134 S. Ct. 1697, 1702, 1706, 188 L. Ed. 2d 698 (2014). However, "circuit court precedent may be 'persuasive' in demonstrating what law is 'clearly established' and whether a state court applied that law unreasonably." Maxwell v. Roe, 628 F.3d 486, 494 (9th Cir. 2010) (citation omitted).

Overall, AEDPA presents "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, ___ U.S. ___, 134 S. Ct. 10, 16, 187 L. Ed. 2d 348 (2013). The federal statute presents "a difficult to meet . . . and highly deferential standard for evaluating state-court

5

1  rulings, which demands that state-court decisions be given the benefit of the
2  doubt." Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557
3  (2011) (citation omitted). On habeas review, AEDPA places the burden on
4  petitioners to show the state court's decision "was so lacking in justification that
5  there was an error well understood and comprehended in existing law beyond any
6  possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103,
7  131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Put another way, a state court
8  determination that a claim lacks merit "precludes federal habeas relief so long as
9  fairminded jurists could disagree" on the correctness of that ruling. Id. at 101.
10 Federal habeas corpus review therefore serves as "'a guard against extreme
11 malfunctions in the state criminal justice systems,' not a substitute for ordinary
12 error correction through appeal." Id. at 102-03 (citation omitted).
13     Where the last state court disposition of a claim is a summary denial, this
14 Court must review the last reasoned state court decision addressing the merits of
15 the claim under AEDPA's deferential standard of review. Maxwell, 628 F.3d at
16 495. See also Berghuis v. Thompkins, 560 U.S. 370, 380, 130 S. Ct. 2250, 176 L.
17 Ed. 2d 1098 (2010); Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115
18 L. Ed. 2d 706 (1991).
19     Here, the Court of Appeal's May 12, 2015 opinion disposing of Petitioner's
20 direct appeal stands as the last reasoned decision. See lodg. 7; Maxwell, 628 F.3d
21 at 495. The Court of Appeal's reasoned decision will, thus, be reviewed under
22 AEDPA's deferential standard of review for claims "adjudicated on the merits."
23 28 U.S.C. § 2254(d); Richter, 562 U.S. at 99.
24 ///
25 ///
26 ///
27 ///
28 ///

# VI.

# **DISCUSSION**

## **PETITIONER IS NOT ENTITLED TO HABEAS RELIEF**

In his sole claim for habeas relief, Petitioner argues the trial court erroneously admitted irrelevant and unduly prejudicial personal-tragedy testimony ("Personal-Tragedy Testimony") from two employees of MADD, thus depriving him of his due process right to a fair trial. Pet. at 5.

### A. ADDITIONAL BACKGROUND

The Court of Appeal summarized the relevant facts as follows:

> Between August 2007 and February 2011, Covarrubias pled guilty three times for driving under the influence of alcohol (sometimes DUI). The court ordered Covarrubias to attend and complete alcohol abuse rehabilitation programs and MADD victim impact panels after each plea. The record indicates Covarrubias attended at least two of the MADD victim impact panels. MADD victim impact panels consist of victims of DUI crashes and their family members relating the physical and emotional pain they have suffered because of drunk driving accidents.
>
> At trial, the People called two MADD employees, Sharry Graham and Desiree Garcia. Graham testified about her position as a "victim advocate" and provided information about MADD victim impact panels, such as the average attendance, the procedures MADD used to record attendees, and a description of the general content of the presentations. Garcia testified she was a development officer for MADD and briefly explained her job duties. Along with their roles as employees, Graham and Garcia regularly presented at MADD victim impact panels. The record shows both Graham and Garcia spoke at the MADD victim impact panels Covarrubias attended.

        Graham testified that a drunk driver hit her son and that she often tells this "tragic story" at MADD meetings. She testified that in one MADD meeting attended by Covarrubias, she described having to sign forms at the hospital indicating her son would likely die from the car crash. Although her son survived, she testified that she explains to attendees of MADD meetings "he's been reissued, because he is not the same boy I gave birth to." She also testified that her son is "[l]ike a newborn baby" because he has had to relearn "how to read . . . how to swallow, how to chew, how to dress himself, everything" and that he is "on a ventilator," has a "brain injury," and is "paralyzed on the left side."

        Graham also testified about her son's suffering: "And while he was only 18 years old and getting ready to graduate from high school, that was never my plan for him, and that was never the plan for himself. And he still asks, How can somebody else decide how my life was going to be? [¶] . . . [A]nd I talk about how he cannot hold a job. He can't. That's not even within the realm of possibility. [¶] . . . [¶] And I also talk about the pain that he's in every day. [¶] And I talk about that he goes around thinking about suicide, because of the pain. That he doesn't know if he can live to be an old man and endure the pain that he does."

        Garcia, like Graham, testified she appeared on MADD victim impact panels including at a meeting attended by Covarrubias. Garcia testified she was raised by a single mother. She depicted her mother as a selfless person who made daily sacrifices to raise Garcia, her only child. Garcia said her mother supported her while Garcia attended college. Garcia then talked about the morning the police informed her that her mother and her mother's boyfriend had been killed by a drunk

> driver: "I remember I was so mad, because I thought, Who had a right to have say on my life? Somebody that I didn't know. That didn't know me changed the entire course of how my life would be played out. That made me think how selfish, how selfish that somebody could have a couple hours of laughs and drinks. And what it came down to is that my mom's life was worth a couple shots of vodka."
>
> Garcia also testified about the aftermath of the DUI crash: "[N]ot only was my mom's life taken, but my mom was with her boyfriend, and his life was taken as well. And he was the father, a single father of a beautiful 11-year-old little girl. [¶] . . . Forget about me for a second, but there was an 11-year-old little girl left without a dad. . . . [¶] The young man is serving a sentence. He was convicted to 16.4 years in state prison. The law eight years ago was a little different, so that's what he was convicted of. He has to serve 11 of those years. [¶] And when he gets out, he gets his life back. But I'm the one with the life sentence, because I have to live with this for the rest of my life."

Lodg. 7 at 4-6.

**B.    STATE COURT OPINION**

The Court of Appeal found the trial court erred when it admitted the Personal-Tragedy Testimony. Lodg. 7 at 11. Specifically, the Court of Appeal concluded "the tragic aftermaths of the DUI crashes experienced by [the MADD witnesses] were wholly unrelated to [Petitioner's] charged offense, including whether he acted with the requisite implied malice." Id. Even assuming the evidence was marginally relevant, the Court of Appeal further noted admission of such evidence was error because it "created a substantial danger of inflaming the jury's passions by engendering similar feelings of sympathy." Id.

1   Nevertheless, the Court of Appeal determined the error in admitting the
2   Personal-Tragedy Testimony "was harmless under any conceivable standard." Id.
3   Specifically, the Court of Appeal cited the evidence presented at trial and found
4   that "even without the personal-tragedy testimony, there is overwhelming
5   evidence in the record supporting a finding of implied malice." Id. at 12. Hence,
6   the Court of Appeal ultimately concluded Petitioner had failed to establish
7   "prejudicial error under either Chapman or Watson." Id. at 13.

8   **C.    RELEVANT LAW**

9   When a state court applies the Chapman v. California, 386 U.S. 18, 24, 87 S.
10  Ct. 824, 17 L. Ed. 2d 705 (1967) standard, a reviewing federal court "may assume
11  that [the state court] found the trial court's error to be a federal constitutional
12  error." Rademaker v. Paramo, No. 14-56946, 2016 WL 4525263, at *4 (9th Cir.
13  Aug. 30, 2016); Davis v. Ayala, ___ U.S. ___, 135 S. Ct. 2187, 2195, 2197 192 L. Ed.
14  2d 323, reh'g denied, ___ U.S. ___, 136 S. Ct. 14, 192 L. Ed. 2d 983 (2015) (making a
15  similar assumption when the state court applied Chapman without deciding
16  whether an error violated the federal Constitution). In reviewing a state court's
17  application of Chapman under AEDPA, the court "'may not award habeas relief
18  under § 2254 unless *the harmlessness determination itself* was unreasonable.'"
19  Ayala, 135 S. Ct. at 2199 (quoting Fry v. Pliler, 551 U.S. 112, 120, 127 S. Ct. 2321,
20  168 L. Ed. 2d 16 (2007)). A state court's decision is not unreasonable if
21  "'fairminded jurists could disagree' on [its] correctness." Richter, 562 U.S. at
22  101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L.
23  Ed. 2d 938 (2004)). Hence, a Petitioner seeking habeas relief "must show that the
24  state court's decision to reject his claim 'was so lacking in justification that there
25  was an error well understood and comprehended in existing law beyond any
26  possibility for fairminded disagreement.'" Ayala, 135 S. Ct. at 2199 (quoting
27  Richter, 562 U.S. at 103). When a petitioner fails to show the harmlessness
28  determination was unreasonable, he "necessarily cannot satisfy" the harmless

error analysis set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) that he was "actually prejudiced" by the trial court's error. Ayala, 135 S. Ct. at 2199; see Fry, 551 U.S. at 120 ("[Brecht] obviously subsumes [AEDPA/Chapman review].").

**D.    ANALYSIS**

In this case, the Court of Appeal applied the Chapman standard when it concluded Petitioner failed to establish "prejudicial error under either Chapman or Watson." Lodg. 7 at 13. Consequently, the Court may assume the Court of Appeal found the trial court's error to be a constitutional violation. See Rademaker, 2016 WL 4525263, at *4. Thus, the only question to be determined here is whether the Court of Appeal reasonably concluded the error was "harmless beyond a reasonable doubt." Id.

As discussed below, based upon the overwhelming evidence supporting the jury's finding, the state court's Chapman finding was reasonable. Petitioner was charged with second degree implied malice murder. Pet. at 2. Under California law, to find a defendant guilty of second-degree murder based on implied malice, the jury must find that at the time of the killing the defendant intended to do an act that is dangerous to human life, with the knowledge that the act threatens life, and with a "conscious disregard" of that threat. See People v. Nieto Benitez, 4 Cal. 4th 91, 104, 13 Cal. Rptr. 2d 864, 840 P.2d 969 (1992) (defining second-degree, implied malice murder) (citing People v. Watson, 30 Cal. 3d 290, 300, 637 P.2d 279 (1981)); Cal. Penal Code § 187 (West 2003) (defining murder); Cal. Penal Code § 189 (defining second-degree murder based on implied malice). Malice may be express or implied. Nieto Benitez, 4 Cal. 4th at 102; Cal. Penal Code § 188. Particularly, malice may be implied in DUI crashes when an individual's conduct demonstrates a "wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created." Watson, 30 Cal. 3d at 298.

1    As the Court of Appeal found, overwhelming evidence – apart from the
2    Personal-Tragedy Testimony – supported the jury's finding of second degree
3    implied malice murder.  As a preliminary matter, the facts establishing Petitioner as
4    the driver who caused the fatal accident are undisputed.  1 CT 210; 2 RT 254.  In
5    addition, extensive evidence established Petitioner's wanton disregard for life and
6    subjective awareness of the risk he created by driving under the influence.  First,
7    the People presented evidence of Petitioner's three prior DUI convictions.  1 CT
8    212-14; 3 RT 594-95; 4 RT 639.  Additionally, the People presented testimony from
9    witnesses describing the court-ordered alcohol education programs and MADD
10   victim panels Petitioner was required to attend as a consequence of his prior DUI
11   convictions.  3 RT 486-88, 492-504; 4 RT 631, 644-50.  These witnesses described
12   the information discussed in these classes and panels, which included lectures on
13   the potential catastrophic consequences of driving under the influence.  Id.  Lastly,
14   the People presented Petitioner's own statements to the police on the day of the
15   crash, which included his admissions, "I remember drinking at that house for
16   several hours," "I was already loaded [before arriving to the house party] – I was –
17   I was at a night club . . . [drinking] tequila mix, tequila and vodka," "Everybody
18   told me not to drive," and "I did it.  I ran the red light.  I killed – I killed a person."
19   1 CT 211-15; 2 RT 254.  This evidence clearly established Petitioner was fully
20   aware of the risks of drinking and driving, and was subjectively aware of the risk he
21   created when he nonetheless chose to drive after consuming excessive amounts of
22   alcohol on the day of the fatal accident.
23   Based upon the overwhelming evidence supporting the jury's finding of
24   second degree implied malice murder, "a fairminded jurist could agree" with the
25   state court's Chapman determination; hence, Petitioner "necessarily cannot
26   satisfy" the requirement of demonstrating he was "actually prejudiced" by the trial
27   court's error.  Ayala, 135 S. Ct. at 2199.  Thus, the Court of Appeal's
28   determination that the erroneous admission of the Personal-Tragedy Testimony

was harmless was not an objectively unreasonable application of <u>Chapman</u>. <u>Id.</u> (citing <u>Fry</u>, 551 U.S. at 119). Petitioner is, therefore, not entitled to habeas relief.

## VII.
## CONCLUSION

IT IS THEREFORE RECOMMENDED that the District Court issue an order: (1) accepting the findings and recommendations in this Report; (2) directing that judgment be entered denying the Petition; and (3) dismissing the action with prejudice.

Dated: December 13, 2016

/s/ Kenly Kiya Kato
HONORABLE KENLY KIYA KATO
United States Magistrate Judge